**Victoria E. ULLMANN, Plaintiff,**

v.

**OLWINE, CONNELLY, CHASE, O'DONNELL & WEYHER, et al., Defendants.**

Civ. A. No. C–3–85–233.

United States District Court, S.D. Ohio, W.D.

Jan. 23, 1987.

Victoria E. Ullmann, Columbus, Ohio, for plaintiff.

Gary Hoppe, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for defendants.

## OPINION AND DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MICHAEL R. MERZ, United States Magistrate.

This case is before the Court on Defendants' Motion for Summary Judgment and for Sanctions, or for Alternative Relief Dismissing the Complaint (Doc. # 6), served April 18, 1985, and filed with the Court on April 23, 1985.

### PROCEDURAL HISTORY

Having initially sought an extension of time within which to respond (Doc. # 10), Plaintiff then filed a Motion to Strike much of Defendants' Motion (Doc. # 20) and sought discovery. On August 5, 1986, the case was referred to the United States Magistrate. Thereafter the parties consented to full magistrate trial jurisdiction (Doc. ## 31, 32) and the Order of Reference was amended to confer jurisdiction under 28 U.S.C. § 636(c).

On October 6, 1986, the Magistrate resolved the pending discovery disputes and set a briefing schedule on the instant motion. Plaintiff filed her Memorandum Contra (Doc. # 40) on November 21, 1986, and Defendants replied on December 12, 1986 (Doc. # 42).

Consideration of that portion of Defendants' Motion which seeks sanctions under Fed.R.Civ.P. 11 will be deferred and is not considered in this Opinion.

The Court has previously denied Plaintiff's Motion to Strike (See Doc. # 34). The arguments made therein as to the evidentiary quality of materials supporting Defendants' Motion will be addressed as and when portions of those materials become relevant to deciding the instant motion.

### STANDARDS FOR SUMMARY JUDGMENT

The standard for evaluating a summary judgment motion is set forth in Fed.R.Civ. P. 56(c): the motion is to be granted forthwith if the submitted evidentiary materials show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211–12 (1986). In *Anderson* the Supreme Court further instructed trial judges to "view the evidence through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513, 91 L.Ed.2d at 215.

Fed.R.Civ.P. 56(c) is fully applicable in employment discrimination cases. *Patmon v. Van Dorn Company, Plastic Machinery Division,* 498 F.2d 544 (6th Cir.1974).

To the extent the matters raised by Defendants are not amenable to treatment under Fed.R.Civ.P. 56, the Court will treat their request for alternative relief under Fed.R.Civ.P. 12(b)(6), recalling that a complaint is not to be dismissed thereunder unless there is no conceivable set of facts a plaintiff could prove to establish liability. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Westlake v. Lucas,* 537 F.2d 857 (6th Cir.1976).

### UNCONTROVERTED FACTS

The following relevant facts are established by admissions of the Plaintiff contained in her affidavit or otherwise proven or by evidentiary submissions of the Defendants which qualify for consideration under Fed.R.Civ.P. 56(e) and are uncontroverted by responsive evidentiary materials from the Plaintiff.

In support of their Motion, Defendants filed the Affidavits of Job Taylor, Barbara Shook, Frieda Brigner, Susan Gingerich, Karen Oswalt, and John Masopust—virtu-

ally all of the principal eyewitnesses to the events upon which Plaintiffs' claims are based. While Plaintiff sought discovery before opposing the Motion, she has filed no materials gained in discovery in opposition to the Motion. Furthermore, she did not seek discovery of any of Defendants' witnesses by deposition. Plaintiff's sole evidentiary reliance in opposition to the Motion is on her own affidavit.

Much of the language in the affidavits of the two principal antagonists, Victoria Ullmann and Job Taylor, expresses their strong emotions about this case. Also in many instances these affiants, both lawyers, have inserted legal conclusions in their affidavits. In ruling on the instant motion, the Court has prescinded from considering these two portions of the affidavits since they are not relevant or material to the decision.

Plaintiff is an attorney at law admitted to practice before the Supreme Court of Ohio on November 5, 1977. (Affidavit of Victoria E. Ullmann, attached to Doc. # 40, ¶ 1; hereinafter "Ullmann Aff."). In February, 1984, she was unemployed and saw an advertisement on the placement office bulletin at the University of Dayton School of Law for a "law clerk" to assist IBM in discovery in litigation it had with NCR Corporation (Ullmann Aff., ¶ 2). The ad was posted by IBM and Ms. Ullmann responded by sending IBM a resume (*Id.*, 113).

Ms. Ullmann was interviewed by Defendant Job Taylor, III, ("Taylor"), then a partner in Defendant Olwine, Connelly, Chase, O'Donnell & Weyher ("Olwine"). Olwine was counsel to IBM in the pending litigation and had decided to hire/retain Dayton residents to conduct the document review at NCR rather than transport Olwine employees from New York. Taylor was initially planning only on hiring paralegals for the work (Ullmann Aff., ¶ 7), but eventually hired/retained Ms. Ullmann at a rate of $15.00 per hour. Four other women were hired/retained for the work through employment agencies which were paid $12.80 per hour in the case of Frieda Brigner, Karen Oswalt, and Susan Gingerich and $11.82 per hour in the case of Barbara Shook (Affidavit of Walter H. Morrissey, Office Manager of Olwine, Exhibits 8 & 9, attached to Doc. # 6, hereinafter "Morrissey Aff."; Ullmann Aff., ¶ 17).

The document review project began with an orientation session on February 28, 1984, conducted by Taylor (Ullmann Aff., ¶ 16). The document review team consisted of the five reviewers, John Masopust from IBM in New York (an employee experienced in document review), and a number of clerical and microfilming personnel (Ullmann Aff., ¶¶ 18, 24).

Document production began on February 29, 1984. Taylor never introduced Ullmann to the NCR attorneys, either as IBM's local counsel or in any other capacity (Ullmann Aff., ¶ 23). After meeting with the NCR personnel on that date, along with Masopust, Taylor left and did not return to Dayton for two weeks (*Id.*).

Taylor returned to Dayton on March 15 and again on March 28, 1984, to review the progress of the document review (Ullmann Aff., ¶¶ 38, 63). On March 29 he terminated Ullmann, but agreed to pay her an amount equal to eighty hours compensation for time she was not expected to work (Ullmann Aff., ¶ 75; Taylor Aff., ¶ 11).

During the time Ms. Ullmann worked on document review, the amount of review accomplished by each of the reviewers, as reported to Taylor by Masopust, was as follows:

| | |
|---|---|
| Frieda Brigner | 123 boxes |
| Susan Gingerich | 117 boxes |
| Barbara Shook | 106 boxes |
| Karen Oswalt | 91 boxes |
| Victoria Ullmann | 44 boxes |

(Taylor Aff., ¶ 10).

Masopust and other members of the review team continually advised Taylor that Ullmann was creating a morale problem because she was not doing very much work, had a disruptive attitude, and acted in a condescending manner toward the other members of the team (Taylor Aff., ¶¶ 9, 11). (Plaintiff claims that material of the sort related in these two paragraphs is inadmissible hearsay; Defendants correctly respond that it is properly offered to show

242

the state of mind of Taylor, to whom the statements were made. *Staniewicz v. Beecham, Inc.*, 687 F.2d 526 (1st Cir.1982); *Brown v. ASD Computing Center, Inc.*, 519 F.Supp. 1096 (S.D.Ohio 1981). Plaintiff has also not controverted the assertion that these statements were made or the computation of the number of boxes of documents reviewed.)

■ Two days after her termination, instead of sending a bill for the eighty hours, Ms. Ullmann began a long series of letters to Taylor stating her grievances. She claims that all of these letters should be inadmissible under Fed.Evid.R. 408 which prohibits admission of statements made in compromise negotiations. For Rule 408 to be applicable, the Court must first determine that compromise negotiations were in fact happening. But no such thing was occurring here. Mr. Taylor never responded to the letters or treated them as offers to settle. In large part the letters consist of Ms. Ullmann's demands upon Taylor and threats of litigation. The purpose of Rule 408 is to encourage dispute resolution, not to encourage threatening litigation by protecting admissions made in such threats. *Big O Tire Dealers, Inc., v. Goodyear Tire & Rubber Company*, 561 F.2d 1365 (10th Cir.1977); 23 Wright & Graham, *Federal Practice and Procedure: Evidence*, § 5306. Considering the correspondence as a whole, the Court finds that the purpose of Rule 408 would not be served by excluding those portions of the correspondence relied upon in this opinion.

On March 31, 1984, Ms. Ullmann wrote Taylor a letter claiming she had a contract for a definite term (the length of the discovery project at NCR) which could only be terminated for breach. She asserted that she had fulfilled the contract but that Taylor had breached it in a number of respects, although it is not clear from the letter what she asserts those breaches are. She does not make a direct accusation of sexual harassment, although she asserts "I should not have been required to win your support by flirting with you." In the next paragraph, however, she accuses Taylor of not

having been elegant enough when asking her to dance. (Taylor Aff., Ex. 1).

Having received no response to her first letter (Ullmann Aff., ¶ 82), Ms. Ullmann wrote again on April 28, 1984 (Taylor Aff., Ex. 2). She raised with Taylor for the first time her concern that her termination might have some adverse effect on litigation in which she was involved in this Court with a former employer. She asked Taylor to meet with her when he was next in town to prevent any such effect, to discuss a "monetary settlement," and to find out what really did happen in her termination.

In response, Taylor did agree to meet her at the Dayton Airport on May 8, 1984 (Ullmann Aff., ¶ 90). At the meeting, Taylor refused any monetary settlement except the payment for eighty hours of unworked time which he had discussed on March 29 (Ullmann Aff., ¶ 94; Taylor Aff., ¶ 18). Ullmann accepted that. (Ullmann Aff., ¶ 94). On May 10, 1984, she sent Taylor a bill for the eighty hours and then added twenty hours of commuting time from her home to the NCR site (Ullmann Aff., ¶ 96; Taylor Aff., ¶ 19 and Ex. 3). Taylor accompanied payment of the bill with a letter indicating he did not agree that either amount was owed, but that Ullmann's acceptance "will be considered by me to be your acknowledgement that you no longer have any claim for any compensation of any type for work either performed or not performed on behalf of my firm or my client in Dayton, Ohio." (Taylor Aff., Ex. 4).

Ms. Ullmann claims that she cashed the check sent with the letter (Ullmann Aff., ¶ 99). However, she does not deny the authenticity of Exhibit 6 to the Morrissey Affidavit, which is a May 29, 1984, letter from her to Morrissey claiming the first check had been lost and asking for the issuance of a new one. Exhibit 7 to the Morrissey Affidavit is an Olwine check for $1,500 payable to and endorsed by the Plaintiff. The documentary evidence confirms the accuracy of the Taylor–Morrissey account: the check sent initially had a restrictive endorsement legend on it which Mr. Morrissey failed to include in the re-

placement check, and it was the replacement check, dated June 7, 1984, which Ms. Ullmann cashed.

The next correspondence was a twelve-page letter from Ms. Ullmann to Mr. Taylor dated July 15, 1984 (Taylor Aff., Ex. 5). Ms. Ullmann begins by candidly admitting "I sent the bill only to keep my options open while I considered the situation. The letter you sent with the check has allowed me to accept it and still retain a number of causes of action, that can still be pursued if necessary." She indicates, however, that litigation would not accomplish her "primary goal" which is "re-establishment of the relationship." (*Id.*, p. 2) She offers her analysis that the morale problem at the NCR site was "that I was the target of resentment." (*Id.* at p. 5) She comments that "My position was undefined, but carried with it an impression of status without power or authority which I think caused tension." (*Id.* at p. 6). She then reviews the history of her involvement with the project and her perception that Taylor never gave her the support necessary to establish her position as an attorney within the group, a position which she appears to have regarded as superior to the others. She claims an attorney should never have to compete with non-attorneys for the professional acceptance of an attorney superior such as Taylor (*Id.*).

At the end of the letter Ms. Ullmann became quite flattering, telling Taylor he had "a graciousness and elegance that I have never seen in anyone else." (*Id.* at p. 11). She asks him to help her get out of the "dreadful rut" she is in; she asserts that she "simply cannot give up on this relationship so easily"; she asks him for a task or assignment and agrees to humbly accept his judgment of her performance. (*Id.* at pp. 11–12). She enclosed copies of a psychological discussion of conflict. Taylor did not respond at all (Ullmann Aff., ¶ 102).

Ms. Ullmann next wrote to Taylor on September 4, 1984. She proposed another meeting but enclosed a form of release in the event Taylor should agree to pay an additional sum of money, a form of reference letter, and another psychology article.

On September 24, 1984, Ms. Ullmann filed a charge affidavit with the Ohio Civil Rights Commission ("OCRC") (Affidavit of Victor A. Machcinski, Ex. 3; hereinafter "Machcinski Aff."). The Charge essentially repeats Ms. Ullmann's allegations that she was not treated professionally by Taylor and that no male in similar circumstances would have been treated in the same manner as she was; she adds for the first time the allegation that Taylor had physically struck her.

On October 31, 1984, Ms. Ullmann again wrote to Taylor (Taylor Aff. Ex. 7) enclosing a copy of a letter to the OCRC proposing to amend her charge. She asserts that Taylor's May 21, 1984, letter to her enclosing the check and her acceptance of it do not prevent her litigating because the letter only covers back pay and because it was obtained through actions of Taylor constituting retaliation for her opposition to his conduct which violated Title VII. She detailed her various theories of recovery and indicated it would be better to settle the matter before litigation.

Mr. Taylor apparently did not respond, because Ms. Ullmann wrote again on December 31, 1984. She threatened him with possible criminal penalties and asked that he call to discuss the matter before she had to file (Taylor Aff., Ex. 9). Again apparently there was no response.

The Complaint herein was filed on March 22, 1985, and Ms. Ullmann again wrote to Mr. Taylor on March 31, 1985, demanding a cash settlement of $40,000 and claiming that her lost wages were at least $20,000 (Taylor Aff. Ex. 10).

## CONTESTED FACTUAL QUESTIONS

The foregoing facts are uncontroverted, but there are a number of areas of basic, historical fact about which the parties disagree.

1. Ms. Ullmann and Mr. Taylor conflict sharply in their accounts of what happened during the initial job interview. (Compare Taylor Aff., ¶¶ 7 & 8 with Ullmann Aff. ¶¶ 7–12). Ms. Ullmann asserts basically that it was at this meeting that Mr. Taylor

agreed to hire her as local counsel for a definite term and treat her as if she were an associate of the Olwine firm. Mr. Taylor insists she was hired/retained solely as a paralegal, the same as the other reviewers, although she was paid somewhat more per hour because of her legal training.

2. Ms. Ullmann describes at length the March 14 and 28, 1984, after-hours meetings of the document review team with Mr. Taylor (Ullmann Aff. ¶¶ 42–58, 63–72). Mr. Taylor offers no contrasting description, but the Olwine firm categorically denied and contested these matters when Ms. Ullmann put them before the OCRC and filed affidavits of all the other document reviewers that they had neither suffered nor observed any sexually discriminatory behavior (Machcinski Aff., Exs. 4 & 9).

3. Ms. Ullmann claims in her Affidavit that Mr. Taylor gave her a swat on the elbow with the back of his hand (Ullmann Aff. ¶ 65). In her Complaint she alleges that on May [so in original; "March" is probably intended] 14, 1984, he placed his hand on her arm without consent (¶ 81) and that on March 28, 1984, without consent he placed his hand on her arm and pressed his knuckles into the inside of her arm (¶ 82). Similar allegations were included in the Plaintiff's Amended Charge Affidavit to the OCRC and Olwine responded (Machcinski Aff., Ex. 9) that those charges were "perjurious, libelous, and a total fabrication."

If any of these questions of fact turn out to be material to the dispute between the parties, then Defendants' summary judgment motion as to any claims for relief turning on these factual questions must be denied. Plaintiff was an eyewitness to these events and this case may not be tried on competing affidavits.

## OPINION

Against this factual background, we turn to an analysis of Plaintiff's Complaint and theories of recovery. The Complaint consists of thirteen separate claims under both federal statutory and state common law, set out in 114 paragraphs. The claims require some grouping for analytical purposes.

### A. Title VII Claims

The First Claim is for disparate treatment in terms, conditions, and privileges of employment during the course of the document review project. Ms. Ullmann alleges she was not accorded the responsibilities and respect or courtesy "that would have been automatically given to any male attorney."

The Second Claim is for disparate treatment in discharge. Ms. Ullmann alleges she was told she was discharged because of having a "know it all" attitude towards the other reviewers and that no male associate at Olwine would have been discharged because of criticism by non-lawyers. In any event, she claims, the alleged reason for discharge is pretextual, the real reason being her refusal to be submissive and "feminine."

The Third Claim is for sexual harassment. Ms. Ullmann claims Taylor gave preferential treatment to the other reviewers who acted in a "seductive, flirtatious, submissive, and 'feminine' manner." This allegedly encouraged them to be judgmental and uncooperative with her and to make unfounded allegations about her productivity.

The Fourth Claim is similar to the First, a claim for sexually discriminatory treatment in the terms and conditions of employment. Ms. Ullmann alleges the other reviewers sexually discriminated against her, complaining about her legal expertise in a way they would not have done with a male attorney, and that Taylor ratified their behavior.

The Fifth Claim is for retaliation. Ms. Ullmann alleges Taylor discharged her because she objected to requirement to attend "business related social functions" and dance with Taylor.

The Sixth Claim is also for retaliation. Ms. Ullmann alleges Taylor promised her eighty hours severance pay but withdrew the offer when she protested, in her March 31, 1984, letter, against the requirement that she flirt with him. (Plaintiff has clari-

fied that the Sixth Claim is intended to be for retaliation in violation of 42 U.S.C. § 2000e–3.) (Doc. # 20, p. 6)

### 1. *The Employee/Independent Contractor Issue:*

█ The protections of Title VII are only available to "employees." 42 U.S.C. § 2000e(f). Since she pleads six claims for relief under Title VII, Ms. Ullmann must be regarded as at least inferentially claiming to be an employee as that term is used in Title VII.

Ms. Ullmann's allegations about her status are not consistent. In the Complaint she alleges (¶ 13) that Taylor "hired her to act as local counsel for Defendant Olwine." In her affidavit, she alleges that she was to be local counsel for IBM (Ullmann Aff., ¶ 14). At another point she claims Taylor told the document reviewers they were hired as Olwine employees to avoid any question about attorney-client privilege (Ullmann Aff. ¶ 20). She also alleges that Taylor promised to treat her "like an associate in the firm." (Ullmann Aff., ¶ 10). "Associate" is a term usually applied in the legal profession to an attorney employee of a law firm who has a fixed salary and does not participate in firm profits or management. *See, Hishon v. King & Spaulding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

In contrast, Defendants insist that Ms. Ullmann was an independent contractor. Mr. Morrissey's affidavit shows that all the reviewers were paid pursuant to invoice, never were placed on the Olwine employee payroll, never had taxes withheld, never completed Olwine employment applications, and so forth. All the other reviewers have submitted affidavits which indicate they considered themselves to be independent contractors (Machcinski Aff., Ex. 4).

There are factors in the document review situation which point both ways on this question. Certainly Olwine exercised the authority to control rather precisely how the work was performed, including place, hours, method, and so forth. The courts have held that the economic realities of the situation will govern the characterization.

*Cobb v. Sun Papers, Inc.,* 673 F.2d 337 (11th Cir.1982); *Spirides v. Reinhardt,* 613 F.2d 826 (D.C.Cir.1979). In light of Ms. Ullmann's reference to the Fair Labor Standards Act in her correspondence with Mr. Taylor, it is important to note that no court has applied the extremely broad FLSA definition of "employee" to Title VII.

It is inappropriate for the Court to attempt an ultimate determination of this question on the pending motion since some of the evidence which is relevant is controverted. The Plaintiff as the non-moving party is entitled to all reasonable inferences on controverted questions. She has presented sufficient evidence to create a genuine issue of fact as to whether she was an employee or independent contractor. Therefore the Court assumes for purposes of the pending motions that she should be characterized as an employee.

### 2. *The Disparate Treatment Claims*

█ Ms. Ullmann's First, Second, and Fourth Claims are for disparate treatment on the basis of sex (Doc. # 40, pp. 8–9). To prevail, she must prove by a preponderance of the evidence that she was disadvantaged with respect to her employment as the result of intentional discrimination by her employer. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). She may proceed either by way of direct or circumstantial evidence of discriminatory motive.

Plaintiff points to three items of allegedly direct evidence of discriminatory motive. She asserts Taylor admitted he was a male chauvinist (Ullmann Aff., ¶ 40). She asserts that Taylor told the document reviewers that a group of IBM executives had coined the term "Jobettes" for the group (Ullmann Aff., ¶ 39). She claims finally Taylor's statement to her that she was being discharged "because her co-workers did not like her ... because she thought she knew more about the law than they did" is direct evidence of discriminatory intent. The Court of course assumes for purposes of the instant motion that

Plaintiff's testimony about these events is true.

None of these items constitutes direct evidence of discriminatory intent sufficient to avoid a motion for summary judgment. The record is totally devoid of any evidence that Taylor did or said anything with respect to Ullmann which disadvantaged her in comparison with any male, similarly situated or otherwise. That fact must be considered along with the allegedly direct evidence of discriminatory intent to evaluate its probative value. While the term "Jobettes" is sexist, its use by Taylor does not logically imply any inclination to terminate a "Jobette" because of her sex or in favor of a male. Taylor may have admitted to being a "male chauvinist," but that is an equivocal admission. Some male chauvinists—of the "Archie Bunker" type—may oppose female employment; other male chauvinists may place women on a pedestal and accord them privileges and deference not given to men. An admission of being a "male chauvinist" outside any context where a man is favored over a woman is simply too equivocal to count as evidence of discriminatory intent.

Finally, Taylor's discharge of Ullmann because she had a "know-it-all" attitude towards her co-workers is not *any* evidence of discriminatory intent towards women. If anything, it shows an animus against lawyers and in favor of non-lawyers. Plaintiff attempts to show this is direct evidence of discriminatory motive by asserting "It goes without saying that no male attorney would have ever been criticized, let alone discharged for having known more about the law than a group of paralegals." (Doc. # 40, pp. 10–11). This seems to be a back-handed way of asking this Court to take judicial notice that no male attorney would be treated this way. But the Court cannot take such judicial notice. In contrast to Plaintiff's assertion, it seems quite likely to the Court that a male attorney hired to do document review with four paralegals and never given any supervisory authority over them who was condescending towards them because he was a lawyer and knew more law than they did might well be criticized for such behav-

ior and perhaps discharged if his attitude was creating serious morale problems and his production was considerably less than the others.

The cases which Plaintiff cites regarding direct evidence of discriminatory motive are far different from this one. For example, in *Lee v. Russell County Board of Education*, 684 F.2d 769 (11th Cir.1982), the school board members voting to terminate black teachers had made comments about the need to increase the number of white teachers in the school and had in fact done so in connection with termination of the plaintiffs.

■ In the absence of direct evidence, Plaintiff can establish discriminatory motive by proof of circumstantial evidence from which, if unexplained, the Court may infer a discriminatory motive. *Furnco Construction Company v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). This the Plaintiff has not done. The Court repeats that there is *no* evidence that Plaintiff was treated differently from any similarly situated male. There were no males among the document reviewers and she was not replaced by a male. She has stated her belief at several points that no male attorney would have been treated as she was (e.g. Doc. # 40, p. 11; OCRC Charge Affidavit, Ex. 3 to Machcinski Aff.); but without some comparative evidence, this claim is speculative and insufficient to raise a genuine issue of material fact. *Gatling v. Atlantic Richfield Co.*, 577 F.2d 185 (2d Cir.1978); *Cermetek, Inc., v. Butler Avpak, Inc.*, 573 F.2d 1370 (9th Cir.1978).

■ The sole factual allegation Plaintiff makes as to a similarly situated male who was treated differently is in Paragraph 25.-b. of the Complaint where she asserts "A male employee at the discovery site committed an act of disloyalty to Defendant Olwine and violated the strict confidentiality clause of the employment agreement. This employee received only a verbal reprimand from Defendant Taylor for this action." This allegation is insufficient to raise a genuine issue of material fact since

it is nowhere supported by evidentiary materials of the quality required by Rule 56 and a party opposing summary judgment may not stand on pleadings alone. Furthermore, Plaintiff has not pleaded sufficient facts from which an inference could be drawn that the male referred to was similarly situated. He clearly was not a document reviewer, since they were all female. Nor was he an attorney, since Olwine had no attorneys at the site other than Taylor and Ullmann. Nor is the Court told what acts he committed so as to be able to compare them with the conduct of Plaintiff.

In sum, with respect to her First, Second, and Fourth Claims, Plaintiff must prove that Defendants disadvantaged her in her employment because she was female. The evidence which she characterizes and relies on as direct evidence of discriminatory motive does not logically prove any such motive. The circumstantial evidence on which Plaintiff relies is insufficient to meet her burden of production of a prima facie case: it simply does not show that any male was or would have been treated differently under the circumstances.

Since Plaintiff has not produced enough evidence to meet her initial burden of production in a Title VII case, the Court need not reach the question whether she has produced enough evidence that Defendants' asserted reasons for discharge were pretextual to require a trial on that question. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiff's First, Second, and Fourth Claims for Relief shall be DISMISSED WITH PREJUDICE.

### 3. Sexual Harassment Claim

In her Third Claim for Relief, Plaintiff asserts that she was sexually harassed by Defendant Taylor. Her claims seem to be a combination of the *quid pro quo* variety of sexual harassment with the "offensive work environment" variant. *See, Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 618–19 (6th Cir.1986).

Factually, Plaintiff claims that Taylor expected all of the document reviewers to behave toward him in a "seductive, flirtatious, submissive, and 'feminine' manner." (Complaint, ¶¶ 29–32). According to Ullmann, the other female document reviewers bought into this approach. They accepted Taylor's invitation to go dancing on the two occasions during March, 1984, when he was in Dayton. During the dancing, they flirted with him, engaged in "provocative" "touch dancing," extensive and excessive consumption of alcohol, placing their hands on Taylor's chest, batting their eyelids at him, and so forth. (Ullmann Aff., ¶¶ 43–58, 65–72). Two of the other reviewers did not want to dance with Taylor but did so because they were afraid of seeming rude. (Ullmann Aff. ¶ 54).

Plaintiff herself was subjected to these situations. Defendant Taylor held her hand for "an uncomfortable period of time." (Ullmann Aff., ¶ 48). He asked her to dance and pressured her into it when she attempted to decline. (Ullmann Aff., ¶¶ 55–57). As best the Court understands Plaintiff's theory of the psychodynamics of the situation, it is this: her co-workers either willingly exploited Taylor's interests in flirtatious female subordinates or at least capitulated to them. In either event, they resented Plaintiff's failure or refusal to do so. They used the advantage their sexual cooperation gave them with Taylor to denounce Plaintiff for being condescending and unproductive. Taylor, already miffed by Ullmann's attitude, accepted their denunciations and fired her.

Defendants' motion papers have little to say about this claim. No evidentiary material is offered to rebut Plaintiff's affidavit on the two dinner/dancing events. Hence the Court must decide solely on the basis of Plaintiff's affidavit whether her allegations are sufficient to raise a genuine issue of material fact on the claim of sexual harassment.

In evaluating Plaintiff's claims, the Court starts with several major premises. First of all, human beings are ineluctably sexual. Every human person has a sexual element to his or her personality; it may be

more or less masculine, more or less feminine. Secondly, this element of personality at least very frequently affects the way people relate to one another. Thirdly, the drive for sexual gratification, both physical and psychological, is strong in very many people and they can be expected to seek that gratification in some or many of the relationships they form.

Traditional moral theory holds that seeking sexual gratification of any kind in any relationship other than marriage is seriously wrong. Obviously the social mores of contemporary America have departed widely from that norm and Title VII does not seek to re-impose it. Rather the EEOC and the courts in dealing with sexual harassment claims recognize employers have power over employees and may use that power to obtain sexual gratification. If the requests for sexual gratification are unwelcome and the employee is disadvantaged for resisting, then she or he has a claim under Title VII.

■ Applying these premises to Plaintiff's claims, the Court finds Plaintiff's affidavit does raise several material issues of fact:

1. Whether Taylor's conduct actually constitutes "sexual advances." While a request to dance, hand holding, and an implicit or explicit request for flirtation may meet this criterion of the EEOC guidelines (29 C.F.R. § 1604.11(a)), they are not as unambiguous evidence of a desire for sexual gratification on the part of the requestor as the type of physical or verbal conduct more frequently met with in these types of cases (e.g. explicit propositions for intercourse, unconsented fondling of breasts, etc.). It may be that upon trial it will be found that the Title VII net is not of fine enough mesh to reach this more ambiguous conduct.

2. Was Taylor's conduct unwelcome? On this issue, Plaintiff faces a credibility question. She claims in her affidavit that "I had been under continual pressure to develop a more personal relationship with my employer than I considered appropriate." (Ullmann Aff., ¶ 72). However, in her correspondence with Taylor, she repeatedly

speaks about re-establishing some unspecified relationship, other than her going back to doing more document review at NCR. Significantly, while she complains in her affidavit about being asked to dance at all, in her July 15, 1984, letter to Taylor she complained that an "informal pecking order" was established among the reviewers by the order in which Taylor asked them to dance and she was at the bottom because she was asked last. Her theory is that as the attorney in the group she was entitled to be asked first to preserve her status. (Taylor Aff., Ex. 5, p. 10).

3. Were the other reviewers willing or unwilling participants in these activities? This impacts on their credibility as witnesses to the asserted non-discriminatory causes of Ullmann's discharge—condescending attitude and low productivity.

4. The ultimate question, did Taylor discharge Ullmann because of her resistance or for other reasons?

These questions are too much dependent upon the credibility of individual witnesses to permit resolution on affidavits. Live testimony, thoroughly tested by cross-examination, is needed to evaluate what actually happened.

Defendants' Motion for Summary Judgment on the Third Claim for relief is OVERRULED.

### 4. Retaliation Claims.

Plaintiff's Fifth and Sixth Claims for relief allege that she was retaliated against by Defendants for engaging in protected activity under Title VII. In the Fifth Claim the assertedly protected behavior is resisting/refusing Taylor's invitations to dance and flirt; the discharge is the asserted retaliatory action. In the Sixth Claim, the assertedly protected behavior is Ullmann's letter of March 31, 1984; the claimed retaliatory action is reneging on the "severance" pay.

The Third and Fifth Claims are factually virtually identical. In the former Plaintiff says she was discharged because she would not engage in what she regarded as inappropriate sexual behavior; in the latter she

claims she was discharged because she protested at being asked to participate in that behavior. As indicated above, evaluation of the discharge in Title VII terms depends too much on the respective credibility of Taylor and Ullmann (and perhaps others) to be resolved on summary judgment motions. The Motion for summary judgment as to the Fifth Claim is OVERRULED.

■ The Sixth Claim for relief in part also states a claim. The letter of March 31, 1984 (Taylor Aff., Ex. 1) is subject to conflicting interpretations, but it certainly does contain a protest against being required to flirt in order to get professional attention and support. Likewise, withholding of the "severance" pay is an adverse employment consequence which, if it was caused by the protest, might be actionable. (Plaintiff may have a difficult time proving causation since the letter, instead of billing Olwine for the eighty hours, makes a substantially larger contract claim for money.)

However, the Sixth Claim for relief must be dismissed because Plaintiff has already recovered all that which she claims she was deprived of as a result of the retaliatory action. As noted above, Olwine already has paid her the $1,200 severance pay which she claimed was withheld in retaliation. This was done in May, 1984, long before any litigation was filed or even any charge made to the OCRC, so there surely can be no entitlement to attorney fees in connection with this claim. As to the retaliation by withholding "severance" pay claim, the Sixth Claim for relief is DISMISSED WITH PREJUDICE.

Plaintiff also appears to be claiming in her Sixth Claim that Taylor has threatened to injure her professional reputation in retaliation for her letter of March 31, 1984. A negative letter of reference might indeed qualify as an adverse employment consequence, actionable if sent in retaliation for protected activity. *O'Brien v. Sky Chiefs, Inc.*, 670 F.2d 864 (9th Cir., 1982); *Coltrane v. Georgia Dep't. of Offender Rehab.*, 23 F.E.P. 1421 (N.D.Ga.1980).

■ However, Plaintiff here does not allege that any negative references have been given or even that Taylor threatened

to do so. She merely alleges that she "reasonably believes" that Taylor's criticism of her behavior is an "implied" threat. This claim is simply too inchoate to be actionable under Title VII. There is simply no evidence sufficient to raise a genuine issue of material fact on the question whether Defendants have retaliated against Plaintiff by giving or threatening to give an untrue negative reference to any potential employer. As to the negative reference portion, the Sixth Claim for relief is DISMISSED WITHOUT PREJUDICE for failure to state a claim upon which relief can be granted.

## B. State Law Claims

Plaintiff's Seventh through Thirteenth Claims purport to plead causes of action under state law. Plaintiff asserts both pendent and diversity of citizenship subject matter jurisdiction, and Defendants do not contest either of these grounds. Of course, in evaluating these claims, the Court must apply Ohio law. *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### 1. *Contract Claims*

In her Seventh Claim for relief, Plaintiff alleges that she had an oral employment contract to act as local counsel to Defendant Olwine, with status, privileges, and responsibility equivalent to an Olwine associate, for pay at $15.00 per hour for whatever period it took to complete the document production at NCR. She claims breach by discharge without just cause.

In her Eighth Claim, Plaintiff re-alleges the same contract and alleges breach by not giving her the status or responsibility of an associate, ridiculing her in front of others, and making determinations of her fitness based upon the opinions of legal assistants. This conduct allegedly breached the implied covenants of good faith and fair dealing in her employment contract and constituted a constructive discharge.

Plaintiff's Ninth Claim appears to be an attempt to plead promissory estoppel. She pleads that because she was told she would

be treated as Olwine associates are treated, she acted as she believed they would act, but she was discharged because she acted that way.

In opposing summary judgment on these claims, Plaintiff adverts to the very different accounts she and Mr. Taylor give of her hiring interview and asserts that these different accounts give rise to a genuine issue of material fact. It is this assertion which the Court must evaluate in deciding the instant motion as it applies to these three (7, 8, 9) claims for relief. The Court notes that there is no written contract, so any express contract must be found from the testimony of Ms. Ullmann and Mr. Taylor.

Plaintiff's testimony, taken alone, contains numerous inconsistencies in describing the asserted contract.

1. At various points she describes herself as having been retained/hired as local counsel either to the Olwine firm (Complaint, ¶ 13) or to IBM (Ullmann Aff., ¶ 14). Ordinarily the attorney-client relationship is an independent contractor one, but that is inconsistent with Plaintiff's claims under Title VII. Consistent with her claim of being local counsel, Plaintiff billed Olwine on an hourly basis.

2. At other points Plaintiff describes herself as an Olwine employee, yet she never claims that her compensation was handled in a manner appropriate for employees (e.g. tax withholding) nor does she claim that she was entitled to any ordinary fringe benefits of employment. She does not dispute the testimony that Olwine employees are paid salaries, are subject to withholding, and receive fringe benefits which she did not get. (Morrissey Aff., ¶ 5)

3. At other points she asserts that Taylor agreed to treat her in the same way an Olwine associate would be treated, yet she does not dispute the testimony that Olwine associates are employees at will who can be terminated at any time with or without cause. (Taylor Aff., ¶ 14; Morrissey Aff., ¶ 5).

The inconsistencies in Plaintiff's description of her agreement with Olwine, taken together with uncontroverted testimony offered by the Defendants, preclude Plaintiff from recovering on her theory for breach of express contract or promissory estoppel.

▮ First of all, if Plaintiff was entitled to be treated as an Olwine associate, as she asserts, then she was subject to termination at will, with or without cause. Defendants have offered competent proof that those are the terms of employment of Olwine associates.

If in contrast Ms. Ullmann had an express contract for a definite term, either as an independent contractor or an employee, then she cannot recover because the Court concludes she was terminated for cause.

In reaching this conclusion, the Court has considered several arguments raised by the parties which require discussion.

▮ Defendants assert that if Ms. Ullmann was retained as local counsel, she could be terminated at will without liability. The Ohio cases Defendants cite for that proposition do not support them. While a client has the power to terminate the attorney-client relationship at will, the client may not do so without liability for breach of contract. *Bolton v. Marshall*, 153 Ohio St. 250, 91 N.E.2d 508 (1950), establishes in ¶ 2 of the syllabus:

> In the absence of an express contract between attorney and client which covers the work to be done by the attorney or an objective to be accomplished by him and specifies the amount or measure of compensation he is to receive therefor, the attorney, upon dismissal by the client, even without cause, is limited to the recovery of the reasonable value of the services he has rendered for the client to the date of dismissal.

The key language here is "in the absence of an express contract." Ms. Ullmann explicitly testifies there was an express contract; and Justice Zimmerman's opinion makes it clear that if there is an express contract, the attorney's damages for breach will be measured by the usual rules for breach of an express contract. The Court's conclusion that Ms. Ullmann cannot recover is *not* based on Defendants' erroneous reading of *Bolton, supra.*

Nor does the Court accept Defendants' argument that, because the term of the contract was not expressed in dates, that it is so indefinite as to be employment at will. Ms. Ullmann testifies she was hired/retained for the length of the discovery project at NCR, expected to be between four and six months. (Ullmann Aff., ¶ 11). This is consistent with at least part of Taylor's testimony (Taylor Aff., ¶ 4) and with the actual practice as to the other document reviewers, all of whom were retained until they decided to leave or until the project was complete. In Ohio, as Defendants assert, a contract of employment for an indefinite term is held to be "at will." *Henkel v. Educational Research Council of America*, 45 Ohio St.2d 249, 344 N.E.2d 118 (1976); *Phung v. Waste Management, Inc.*, 23 Ohio St.3d 100, 491 N.E.2d 1114 (1985). But the fact that the contract here, as testified to by Ms. Ullmann, was for a term limited by a condition —completion of the discovery—does not make it for an indefinite term.

Since the agreement was an express one for a sufficiently definite period of time, the Court agrees with Ms. Ullmann's conclusion that the contract could only be terminated for good cause. However, the uncontroverted evidence before the Court establishes that there was good cause for the termination. Ms. Ullmann admits that the one function she was supposed to perform was document review and she does not controvert the Affidavit of John Masopust that she reviewed less than one-half as many boxes as the next least productive reviewer and fewer than one-third as many as the most productive reviewer. She was being paid several dollars per hour more than the others but performing substantially less work. That constitutes just cause for termination.

Plaintiff's Seventh, Eighth, and Ninth Claims for Relief are DISMISSED WITH PREJUDICE.

### 2. *Tort Claims*

Plaintiff's Tenth Claim for relief sounds in fraud, but fails to state a claim upon which relief can be granted. Plaintiff has claimed that she relied on Taylor's representations in taking the position, but she has failed to set forth in her affidavit any compensable detriment which she suffered as a result of the alleged misrepresentations. In particular, he allegedly induced her to take the position, but she admits that at $15.00 per hour she was being paid more than twice what her former position at Legal Aid paid her. (Ullmann Aff., ¶ 14). She has not asserted that there were any competing positions which she passed up to take this one and would have taken but for Taylor's misrepresentations. The Tenth Claim for relief is DISMISSED WITHOUT PREJUDICE for failure to state a claim upon which relief can be granted.

Plaintiff's Eleventh Claim for relief is apparently intended to sound in assault. (See Doc. # 40, p. 19). It fails to state a claim upon which relief can be granted in that it fails to allege, as to the battery aspect, that the Plaintiff was injured physically or that Taylor intended to inflict physical injury. 6 Ohio Jur.3d *Assault—Civil Aspects* § 4. As to the assault aspect of the claim, Taylor's acts complained of by Ullmann are not such as to cause a reasonable fear of immediate physical violence. *See, Rice v. Reed*, 66 Ohio L.Abs. 385, 117 N.E.2d 183 (1951).

Not only has Plaintiff failed appropriately to plead the assault, but her affidavit does not set forth facts sufficient to avoid summary judgment on this claim; the facts on this incident in the affidavit (¶ 36) are considerably weaker than those pleaded and bring this case within the rationale of *Rice v. Reed, supra*. Plaintiff's Eleventh Claim for relief is DISMISSED WITH PREJUDICE.

Plaintiff's Twelfth Claim for relief is for intentional infliction of emotional distress. (See Doc. # 40 at 19). The Ohio Supreme Court has supplied the standard by which conduct must be gauged if it is to create such liability:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has

intended to inflict emotional distress, or even that his conduct has been characterized by 'malice', or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.... plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

*Yeager v. Local Union 20,* 6 Ohio St.3d 369, 374–75, 453 N.E.2d 666 (1983). Actionability of particular conduct must be judged by the objective standards of the community, not by a particular plaintiff's subjective sensibilities. *Reamsnyder v. Jaskolski,* 10 Ohio St.3d 150, 462 N.E.2d 392 (1984); *Koenig v. Dayton,* 28 Ohio App.3d 70, 502 N.E.2d 233 (Montgomery Cty.1985).

As factual basis for this claim, Plaintiff relies upon acts of Taylor both before and after her discharge:

1. As to the first dinner meeting, she relates that Taylor commented, perhaps unfavorably, on the way she had re-combed her hair. (Ullmann Aff., ¶ 47). She also testifies that Taylor said "no" and placed his hand on her arm when she poked fun at the "outrageous flirting" that was going on. (Ullmann Aff., ¶ 50).

2. At the second dinner meeting she again made a "teasing" remark about the flirting, Taylor again said "no," and this time swatted her elbow. (Ullmann Aff., ¶ 65) He then failed to talk to her during dinner except to ask if she wanted a Caesar salad. (Ullmann Aff., ¶ 68). After dinner he ridiculed her by calling her his "local counsel that never smiles at me." (Ullmann Aff., ¶ 71).

3. He discharged her in front of others, telling her it was because she was creating a morale problem and amplifying that it was because she acted a know-it-all. (Ullmann Aff., ¶ 75).

4. In his meeting with her at the Dayton Airport on May 8, 1984, he engaged in a "vitriolic verbal attack," referring to her March 31, 1984, letter as "haughty" and "unprofessional."

The Court of course is relying solely on Ms. Ullmann's account of what happened since she is the non-moving party. Accepting totally her account of these events, the Court finds that no reasonable jury could conclude that they were sufficiently outrageous to meet the *Yeager* standard. Particularly as to conduct after the discharge, Ms. Ullmann was an experienced attorney who had cast herself in the role of opposing counsel to Mr. Taylor; she ought not to have expected that her demand for substantial sums of money or a position with Mr. Taylor's firm would have elicited a gentle and courteous response. Her letters to Taylor certainly prove that she was able to give at least as well as she got in potentially threatening and intimidating language.

The Twelfth Claim for relief is DISMISSED WITH PREJUDICE.

### 3. *Claim for Declaratory Judgment*

■ In the Thirteenth Claim, Plaintiff seeks a declaration of this Court that her agreement to accept $1,500 from Olwine does not bar the claims made in this case. Defendants respond that this is not an appropriate claim because they had not as yet pled release or accord and satisfaction as an affirmative defense to her claims.

The Court finds Defendants' position is not well taken. Clearly there was an agreement between the parties for the $1,500 about whose effect there was a dispute, certainly at least as soon as Plaintiff filed her Complaint. The appropriate interpretation of that agreement is a proper subject for declaratory relief. Defendants' Motion to dismiss the Thirteenth Claim is OVERRULED.

### SUMMARY

The First, Second, Fourth, Seventh, Eighth, Ninth, Eleventh, and Twelfth Claims are dismissed with prejudice in their entirety. The Sixth Claim for Relief is

dismissed with prejudice with respect to the severance pay claim and dismissed without prejudice for failure to state a claim upon which relief can be granted as to the "letter of reference" claim.

The Tenth Claim for Relief is dismissed without prejudice for failure to state a claim upon which relief can be granted.

Defendants' motion for summary judgment or to dismiss for failure to state a claim as to the Third, Fifth, and Thirteenth Claims is overruled.

FURTHER PROCEEDINGS

Defendants shall file their Answers to the Third, Fifth, and Thirteenth Claims not later than February 6, 1987. Promptly thereafter the Court will arrange a scheduling conference to pick a trial date and discuss discovery scheduling. Based upon the number and nature of the remaining claims in the case, the Court expects discovery to be abbreviated and the case to be tried in short order.

Defendants Rule 11 motion has not yet been decided because it is not yet, in the Court's mind, ripe for decision. As the Court understands Defendants' position, it is that the Complaint is brought for totally improper purposes, even if there are some colorable claims. Determination of those purposes cannot really take place until after trial.