**SNYDER, Appellant,**

v.

**TURK, Appellee.**

[Cite as *Snyder v. Turk* (1993), 90 Ohio App.3d 18.]

Court of Appeals of Ohio,
Montgomery County.

No. 13710.

Decided Aug. 19, 1993.

*Michael K. Murry,* for appellant.

*David C. Greer* and *Sharon L. Ovington,* for appellee.

WILSON, Judge.

The facts in this case occurred during a gall bladder removal operation at St. Elizabeth Medical Center on September 3, 1991. The operation took approximately one and one-half hours. The operating surgeon was the defendant-appellee, Dr. Robert Turk. The plaintiff-appellant, Barbara Ann Snyder, was the scrub nurse. The patient, another doctor, a medical student, and two other nurses were present during the operation.

Snyder filed a complaint seeking damages from Dr. Turk based upon allegation of intentional infliction of emotional distress, civil battery and slander.

The plaintiff has appealed from the order dismissing her complaint with prejudice after the trial court removed all issues from jury consideration by granting the defendant a directed verdict at the close of the plaintiff's case-in-chief. In her three assignments of error, the plaintiff contends that the trial court erred in granting a directed verdict on each of the three claims.

■ Dr. Turk began to perform a laparoscopic cholecystectomy. When difficulties occurred during the procedure, Dr. Turk converted the operation to an open procedure. Dr. Turk testified that "I had reached a level of frustration both by the difficulty of the procedure and the difficult exposure and with the instruments." He was also not happy with Snyder's performance.

The plaintiff testified that Dr. Turk entered the operating room a little after 5:30 p.m. followed by Dr. Clark:

"[A.] I said good afternoon Dr. Turk and he didn't say anything.

" * * *

"Q. Any conversation at this time between you and the defendant?

"A. Dr. Turk looked at Dr. Clark at that point and said, 'She's already made three mistakes.'

"Q. Did you respond?

"A. I said, what have I done Dr. Turk? and he ignored me.

"Q. Does the laparoscopic procedure begin at this point?

"A. Yes.

"Q. And what talk about the, sort of the beginning of the procedure, how does it get going?

"A.  Well the beginning of the procedure, I hand off the light cord and the circulating nurse attaches the camera head to the telescope and we start the procedure as planned.

"Q.  Was there some problem with trocars or the tubes that will go through the gentleman?

"A.  Yes.

"Q.  What was the problem?

"A.  Dr. Turk had difficulty inserting the trocar through the abdomen.  He had to make a couple attempts.  He wasn't getting into the peritoneum which allowed him to get into the abdominal cavity which allowed him to blow the $CO_2$ in, the gas.

"Q.  Did Dr. Turk make any comment to you that you had given him the wrong—

"A.  He made a comment like, you sabotaged this case again."

At this point, Dr. Turk asked for a longer trocar.  It is clear from the evidence that longer trocars were obtained from a supply cupboard.

Dr. Turk then inserted the video camera; however, the picture was a little hazy.  The plaintiff attempted to eliminate the hazy picture:

"He said, don't you know how to trouble shoot?  Why are you so incompetent?  Why would they put somebody in who doesn't know how to use the equipment."

At about this point, the operation was converted to an open incision to do the open cholecystectomy, after Dr. Turk identified a gangrenous gall bladder and Dr. Clark identified it as being friable.  The open procedure required a six-inch incision.

After testifying about the conversion, the plaintiff identified plaintiff's exhibit 4 as a regular right-angle clamp, which is used to clamp off blood vessels.

The questioning of the plaintiff then continued:

"Q.  Did there come a time when the defendant asked for a right angle?

"A.  Yes.

"Q.  And what did he say?

"A.  Right angle please.

"Q.  Did he specify length?

"A.  No.

"Q.  What did you hand him?

"A.  A right angle.

"Q. Did you hand him a tool just like Plaintiff's Exhibit 4?

"A. Yes.

"Q. And when you say you handed it to him, how does that actually happen, you know, what hand are you handing it to, what hand are you using? How is that actually happening across this person's body?

"A. He's standing across from me. I'm right handed, I'd hand it to his right hand. He's reaching his hand out and I put it in his hand.

"Q. You put it in your left hand?

"A. Right, it would be his right hand.

"Q. Where's his left hand?

"A. In the patient's abdomen helping restrict the abdominal cavity.

"Q. When you hand the right angle to the defendant, what happens?

"A. He takes the clamp from me and then he looks at it like he was going to use it and he throws it back at me.

"Q. And what, when you say he threw it back at you, where does the clamp go?

"A. To my mago tray.

"Q. What happens next?

"A. That's when I'm standing there and when he reached up and grabbed my shoulder and my gown and pulled me down from a standing position instantly down to the surgical wound and started screaming, can't you see where I'm working? I'm working in a hole. I need long instruments. I need long right angles now.

"Q. What part of Dr. Turk's body was in contact with yours?

"A. His hand.

"Q. Which hand?

"A. Right hand.

"Q. And I believe you pointed out which shoulder or please show the jury exactly where he makes contact with you?

"A. Right, my left shoulder and down.

"Q. Now immediately before this happened, what, in what position are you? Are you standing, seated, kneeled over; what position are you when he makes contact with your left shoulder?

"A. I'm standing, still on a standing stool.

"Q. And when, you know, right after he makes contact with you, what happens?

"A. I'm pulled from a standing position immediately down to like a 90 degree angle, right down onto the surgical field.

"Q. Did you voluntarily move from wherever you were standing down to the surgical field?

"A. No.

" * * *

"Q. Where is your face in the end in relation to the patient there on the table?

"A. Looking right down into the surgical wound.

"Q. And how far is your face from the wound?

"A. Maybe 12 inches.

"Q. Do you remember what you thought and felt at that time?

"A. I was shocked; I was startled. I was scared. I didn't know what was going to happen next, if he was going to hit me—I was just, totally disbelief that this happened.

"Q. How long was your face down by the surgical incision?

"A. Just a very short time.

"Q. So what happens next?

"A. I stand up and try to gain my composure.

"Q. Do you remember what you were thinking or how you were feeling?

"A. I felt like a piece of shit. I had never been humiliated in my whole life. In front of medical students, surgical residents, nursing personnel, professional people, I'm pulled down into this patient's wound. I don't know if I'm going to fall over. He's yelling at me and. I'm just shaken.

"Q. What's the next thing that happens?

"A. I turn around and ask Sue to please get me right angles, long right angles.

"Q. Did she?

"A. Yes.

"Q. How long did that take?

"A. Less than a minute.

"Q. When she brought you the long right angles, what did you do with them?

"A. I—I gave them to him.

"Q. What's the next thing that happens with you?

"A. I'm very emotional and I—mean, you know I'm shaken and I ask Sue to please get me relief, I said get Chris, who's the evening supervisor, and please get me some relief.

"Q. Anyone get you relief?

"A. Chris came into the room and I was told that I had to finish the procedure because we have three operating rooms running and there is no one to relieve me.

"Q. Did you stay and finish the procedure?

"A. Yes I did.

"Q. And how much longer did that take?

"A. Probably another half hour.

"Q. Did the defendant make any comments to you or about you during that additional half hour or so?

"A. Yes he did.

"Q. What did he say?

"A. He was talking to Dr. Clark and he kept saying he told him, I don't understand why she's so incompetent, must be passive-aggressive behavior. All she is here to get her paycheck. She's just looking for the time when she can leave.

"Q. Did you respond to any of those comments?

"A. I said, Dr. Turk, I do not appreciate those comments. I have been here many years. I do care about my job, I care about the patient laying [*sic*] on the table and that's why I'm going to finish this procedure."

The plaintiff also testified that she did not suffer any physical injury from her contact with Dr. Turk.

We agree with the trial court that plaintiff's evidence was insufficient to support a claim based on either outrageous conduct or serious emotional distress. *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666; *Plikerd v. Mongeluzzo* (1992), 73 Ohio App.3d 115, 596 N.E.2d 601; *Reamsnyder v. Jaskolski* (1984), 10 Ohio St.3d 150, 10 OBR 485, 462 N.E.2d 392; *Koenig v. Dayton* (1989), 28 Ohio App.3d 70, 28 OBR 111, 502 N.E.2d 233. The second assignment of error on this issue is overruled.

■ The parties agree that a "battery" is defined as an intentional, unconsented-to contact with another. The appellee contends that there is no liability for the commission of a battery absent proof of an intent to inflict personal injury.

Dr. Turk further contends that the directed verdict was properly granted on the battery liability issue because of the absence of evidence that he intended to inflict personal injury.

The defendant has cited several cases in support of his position, including our opinion in *Rice v. Reed* (1951), 66 Ohio Law Abs. 385, 117 N.E.2d 183, and *Ullmann v. Olwine, Connelly, Chase, O'Donnell & Weyher* (S.D.Ohio 1987), 123 F.R.D. 237.

The Franklin County Court of Appeals has held that liability for the intentional tort of battery occurs when there is a battery plus harmful *or offensive contact*. *Scott v. Perkins* (1975), 74 O.O.2d 280. The rule in this case appears to be the same as the Restatement of Torts on this issue.

The Supreme Court of Ohio has referred to the Restatement rule with approval in *Love v. Port Clinton* (1988), 37 Ohio St.3d 98, 524 N.E.2d 166. The following appears in the body of the opinion:

"A person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results. Restatement of the Law 2d, Torts (1965) 25, Section 13. Contact which is offensive to a reasonable sense of personal dignity is offensive contact. See Restatement of the Law 2d, Torts, *supra*, at 35, Section 19." *Id.* at 99, 524 N.E.2d at 167.

Section 18 of the Restatement provides:

"Topic 2. THE INTEREST IN FREEDOM FROM OFFENSIVE BODILY CONTACT

"§ 18. Battery: Offensive Contact

"(1) An actor is subject to liability to another for battery if

"(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

"(b) an offensive contact with the person of the other directly or indirectly results.

"(2) An act which is not done with the intention stated in Subsection (1,a) does not make the actor liable to the other for a mere offensive contact with the other's person although the act involves an unreasonable risk of inflicting it and, therefore, would be negligent or reckless if the risk threatened bodily harm."

In both *Rice* and *Ullmann* it appears that the plaintiffs were unable to show an intent to cause either a harmful contact or an offensive contact. If this is the case, the judgments in both cases are consistent with the Restatement.

A motion for a directed verdict assumes the truth of the evidence supporting the facts essential to the claim after giving the nonmovant the benefit of all reasonable inferences from the evidence and refers the application of a reasonable-minds test to such evidence. It is in the nature of a demurrer to the evidence. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935.

Applying the above test we believe that reasonable minds could conclude that Dr. Turk intended to commit an offensive contact. The first assignment of error is sustained.

In the last assignment of error the plaintiff states that the trial court erred in granting a directed verdict on the slander claim.

The plaintiff testified that she is an experienced and competent registered nurse and that she was not in the operating room just to draw a paycheck. She further testified that she was not more concerned about getting off work than about the patient on the operating table. Additionally she testified that she had been damaged as a result of the alleged slander.

Slander "is a false publication causing injury to a person's reputation, or exposing her to public hatred, contempt, ridicule, shame, a disgrace, and affecting her in her trade or business." 2 Ohio Jury Instructions, Section 264.01.

"The publication is privileged when it is 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.'" *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 244, 72 O.O.2d 134, 138, 331 N.E.2d 713, 718, quoting from an 1834 English case.

Other definitions of "privilege" appear in various other cases and publications. There is also a statutory definition in R.C. 2901.01(L).

In our opinion, some of the statements made by Dr. Turk fall within the definition of "slander." It is also our opinion that the statements were made under circumstances where a qualified privilege may apply.

The comment to 2 Ohio Jury Instructions, Section 264.06 (Qualified Privilege) provides in part:

"Factual issues, such as good faith of the claim *and whether the qualified privilege was abused or exceeded, are for the jury*" (Emphasis added.)

In our view, the trier of fact could reasonably conclude that some of Dr. Turk's slanderous remarks exceeded the qualified privilege.

The third assignment of error is sustained.

We reverse and remand for further proceedings consistent with the opinion.

*Judgment reversed*
*and cause remanded.*

WOLFF, J., concurs.

BROGAN, J., concurs separately.

RICHARD K. WILSON, J., retired, of the Second Appellate District, sitting by assignment.

BROGAN, Judge, concurring separately.

I concur in the judgment of my colleagues that we should reverse the trial court's judgment and order a new trial in this matter. I concur because I believe the evidence in the record was sufficient for a reasonable juror to conclude that the defendant had committed a battery when he allegedly grabbed the plaintiff and brought her down to within twelve inches of the surgical wound. See *Love v. Port Clinton, supra,* 37 Ohio St.3d at 99, 524 N.E.2d at 167; *Belcher v. Carter* (1967), 13 Ohio App.2d 113, 42 O.O.2d 218, 234 N.E.2d 311; and Restatement of the Law 2d, Torts (1965), at 35, Section 19.

I would affirm the trial court's directing a verdict on the slander claim. I do not believe a reasonable juror could find that Dr. Turk's remarks were not qualifiedly privileged. *Hahn v. Kotten, supra,* at the syllabus.