*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

ALLEN HOGAN,

          *Plaintiff-Appellant,*

    *v.*

UNITED STATES OF AMERICA,

          *Defendant-Appellee.*

No. 03-4637

─────────────

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 99-01371—James L. Graham, District Judge.

Argued: April 22, 2005

Decided and Filed: May 10, 2005

Before: SUHRHEINRICH and GILMAN, Circuit Judges; ACKERMAN, District Judge.[*]

─────────────

## COUNSEL

**ARGUED:** David R. Kostreva II, CURRY, ROBY, SCHOENLING & MULVERY, Columbus, Ohio, for Appellant. Steven M. Talson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Robert S. Roby, CURRY, ROBY, SCHOENLING & MULVERY, Columbus, Ohio, James D. McNamara, Columbus, Ohio, for Appellant. Steven M. Talson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

─────────────

## OPINION

─────────────

RONALD LEE GILMAN, Circuit Judge. Allen Hogan, the owner of a 27-acre tract of land in Mansfield, Ohio, brought suit under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), to recover for damages he allegedly suffered when his property was contaminated by radioactive scrap metal that he purchased from the United States Air Force. The government conceded liability, but denied the existence of any damages. Following a three-day bench trial on the sole issue of damages, the district court entered judgment in favor of the government.

Hogan argues on appeal that the district court erred in (1) finding that there had been no diminution in the value of his property as a result of the radioactive contamination, and (2) failing

───────────────

[*]The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

to separately value the sandstone deposits located on the land in determining the overall loss of the property's value. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.      Factual background

Hogan owns a 27-acre, irregularly shaped tract of land situated between U.S. Route 30 and Ohio State Route 545 in Mansfield, Ohio. The property is zoned for light industrial use. Nearby is a major electrical substation, and Hogan's property is crossed at various points by high-voltage power lines and towers. The majority of the land is quite rugged, with dramatic changes in elevation. A unique variant of sandstone is located on the rugged portion of the property. The tract was in fact used as a quarry nearly 100 years ago, with the effects of this previous mining activity still visible on the land. One corner of the property is relatively flat, however, and for years Hogan used this land as the site of his automobile salvage yard and scrap metal business.

This lawsuit arises out of Hogan's 1994 purchase of approximately 2,900 pounds of scrap metal from the Air Force at an auction. He brought the metal to his property in Mansfield, where he added it to crushed automobiles to increase their weight before selling them to automobile recyclers. In November of 1996, a recycler who had bought several automobiles from Hogan called to inform him that a routine test had revealed that the crushed vehicles purchased from Hogan's yard were emitting radiation. Hogan then contacted the Air Force, which inspected the Mansfield property the following month. The Air Force determined that it had inadvertently sold Hogan scrap metal containing a magnesium-thorium alloy (mag-thor) used in the production of missile nose cones.

Thorium is a radioactive element that exists naturally in the environment. It is found in the soil and in a number of foods, including vegetables and dairy products, and it is used in many consumer goods, such as light bulbs and microwave ovens. Because thorium emits radiation very slowly and in very small amounts, it is not an external radiation hazard. A person can receive a harmful dose of thorium radiation from the mag-thor alloy only by inhaling it. The alloy may be handled without gloves and can be in contact with the skin for prolonged periods of time without posing a health risk.

In June of 1997, the Air Force hired a private contractor to remove the mag-thor alloy from Hogan's property. This extensive cleanup effort took three-and-a-half weeks, cost the government over $80,000, and was overseen by officials from both the United States Nuclear Regulatory Commission (NRC) and the Ohio Department of Health (ODH). The metal that Hogan purchased from the Air Force had been crushed prior to sale into thousands of pieces, some of which were quite small. Hogan had piled the metal in several different locations on his property. Because mag-thor is only weakly radioactive, as little as one inch of soil can prevent small pieces from being detected. Complete cleanup of the property was therefore impossible, and the Air Force does not dispute that some mag-thor remains on the property. Accordingly, the Air Force provided Hogan with a special barrel to collect and store additional mag-thor pieces discovered after the cleanup.

Hogan has since recovered about 50 pounds of mag-thor, including one large piece that he found under a pile of other scrap metal. Even though the land could not be completely restored, the NRC and the ODH issued reports stating that the residual mag-thor on Hogan's property does not pose a threat to human health.

## B.       Procedural background

In January of 1999, Hogan filed an administrative claim with the Air Force, seeking $115,000 for property damage and $1.2 million for personal injuries. He filed a second claim in April of 1999, seeking an additional $10 million in nuisance damages. The Air Force denied the claims in June of 1999 on the basis that Hogan had failed to file within the applicable two-year statute of limitations.

Hogan then brought suit against the Air Force in the United States District Court for the Southern District of Ohio, seeking recovery under the FTCA for personal injuries and property damage. The district court dismissed Hogan's claims, finding that the two-year statute of limitations had expired. This court affirmed the district court's dismissal of Hogan's personal-injury claim, but held that equitable tolling applied to his property-damage claim. *Hogan v. United States*, No. 01-3073, 2002 WL 1774227 (6th Cir. July 31, 2002) (unpublished).

On remand, the government conceded liability for the contamination of Hogan's property, but denied that any permanent damage had occurred. A three-day bench trial was held on the sole issue of damages. Both parties presented expert testimony regarding the effect of the mag-thor on the value of Hogan's property. The district court entered judgment in favor the United States after concluding that the property had suffered no diminution in value as a result of the contamination. This timely appeal followed.

## II. ANALYSIS

## A.       Standard of review

Whether Hogan suffered a diminution in the value of his property is a factual finding of the district court that may be set aside only if clearly erroneous. *See* Fed R. Civ. P. 52(a); *Hoffman v. Prof'l Med. Team*, 394 F.3d 414, 417 (6th Cir. 2005) (applying the clearly erroneous standard in reviewing the district court's factual findings). And where, as here, "findings are based on determinations regarding the credibility of witnesses, . . . even greater deference to the trial court's findings" is warranted. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). Whether Hogan's sandstone deposits may be valued separately from his land, however, is a question of law that we review de novo. *See Palmer v. United States*, 146 F.3d 361, 366 (6th Cir. 1998) (reviewing de novo a claim that the district court erred in calculating damages under the FTCA).

## B.       The district court's finding that there had been no diminution in the value of Hogan's property was not clearly erroneous

The main thrust of Hogan's argument on appeal is that the presence of the residual mag-thor on his property has permanently contaminated the land and rendered it essentially unmarketable. He does not contend, however, that the district court employed the wrong test for determining the value of the property under Ohio law. *See Reeser v. Weaver Bros., Inc.*, 605 N.E.2d 1271, 1274 (Ohio Ct. App. 1992) (stating the Ohio "rule that if the land has sustained a permanent or irreparable injury, damages are limited to the difference in the market value of the property, including improvements, before and after the injury") (citing *Ohio Collieries Co. v. Cocke*, 140 N.E. 356, 359 (Ohio 1923)). Rather, Hogan insists that the district court erred in determining that the value of his property has not been diminished by the mag-thor contamination.

The district court credited the government's evidence, however, and found that the residual mag-thor on the Hogan property presents no threat to human health. This evidence included letters from the NRC and the ODH, which conclude that the contamination has been remediated. A government radiation expert also testified that the thorium radiation on the property is no different than normal background levels, and that the land could be used for residential or commercial uses

without governmental restriction. Based on this evidence, the district court found that "[a]fter the clean-up of Hogan's property, thorium could be detected only at normal background levels of 1 pico-curie per gram," and that the "NRC standard for clean-up is 10 pico-curie per gram, or ten times the amount which could be detected by instruments on the Hogan property following the clean-up." Because Hogan presented no evidence that the remaining mag-thor was harmful or present in quantities any greater than that admitted by the government, the district court's finding that the remaining mag-thor on the property is "residual" and "not a threat to human health" is not clearly erroneous.

Hogan also alleges that the district court erred in relying on the testimony of the government's appraiser, who found that the mag-thor radiation had not caused any diminution in the value of Hogan's property. According to Hogan, "common sense and every day experience" suggest that the remaining mag-thor "certainly would have *some* affect [sic] upon the purchase price." Although Hogan's position has a certain intuitive appeal, the evidence presented at trial persuaded the district court to the contrary. The court observed that "[t]o accept Hogan's position, the court would have to find that any property which has been subjected to environmental contamination is rendered unsaleable even after the contamination has been remediated to government standards. This flies in the face of common sense and everyday experience."

The appraiser hired by Hogan and the appraiser retained by the government agreed that the highest and best use of Hogan's property was as an automobile salvage yard. Both appraisers also used the "comparable sales approach" in determining the value of the property. Hogan's appraiser found that the property was worth $317,000 before the contamination but worth nothing after the contamination. In contrast, the government's appraiser determined that the property was worth $110,000 both before and after the contamination, so long as the purchaser did not demand additional environmental testing. But the government's appraiser further opined that, because of the property's past history as an automobile salvage yard, any reasonable buyer would demand a "Phase II environmental evaluation," which would cost approximately $84,000. This, in his opinion, reduced the property's value to $26,000 both before and after the contamination.

The district court found that Hogan's appraiser, in arriving at his estimate of the property's value, (1) was unaware of the letters written by the NRC and the ODH confirming that the contamination had been remediated in accordance with governmental standards, (2) did not take into account the cost of further environmental testing that was likely to be required in light of the property's former use as an automobile salvage yard, (3) failed to include comparable sales of property by the City of Mansfield, "the largest owner of industrial real estate . . . [that] dominates the market," (4) included, as evidence of comparable *sales*, the *listing* prices of two properties, and (5) included two high-value sales from counties outside of the Mansfield area that were experiencing considerably greater economic growth. Finally, the district court observed that the original appraiser hired by Hogan in 1999 had determined that the property had a value of $115,000 prior to its contamination, much less than the figure reached by Hogan's second appraiser.

After considering all of the above factors, the district court determined that the testimony of the government's appraiser was "more credible and persuasive" than the testimony offered by Hogan's second appraiser. We agree. In sum, we conclude that the district court did not clearly err in finding that the net value of Hogan's property was $26,000 both before and after the mag-thor contamination. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").

**C.      The district court did not err in failing to separately value the sandstone deposits on Hogan's land**

Hogan also maintains that the district court erred as a matter of law when it refused to add the value of the property's sandstone deposits in calculating the fair market value of the property. At trial, Hogan introduced testimony from a mineral appraiser who estimated that the present value of the sandstone on the property would be $435,519 if not for the mag-thor contamination. Adding this amount to the property's $317,000 value for commercial purposes (as determined by Hogan's second real estate appraiser), results in a total valuation of $752,519 for the property. Hogan's mineral appraiser testified that the sandstone had no commercial value after the mag-thor contamination, however, because sandstone dealers would refuse to buy the stone, believing it to be radioactive.

"Under Ohio law, mineral deposits are generally not subject to valuation separate and apart from the land in which they are located." *Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement*, 962 F.2d 1192, 1199 (6th Cir. 1992). Although "the existence of mineral deposits in or on the land is to be considered in determining the market value of the land[,] . . . the value of such mineral deposits cannot be separately determined independent of the value of the land of which they are a part." *Preston v. Stover Leslie Flying Serv., Inc.*, 190 N.E.2d 446, 450 (Ohio 1963); *cf. Bd. of Park Comm'rs v. DeBolt*, 474 N.E.2d 317, 320 (Ohio 1984) (carving out an exception to the rule where there was a preexisting contract for the sale of the timber on the property because the contract was "an asset separate and apart from the land, [which] is subject to separate valuation").

The district court concluded that the appraisal of the sandstone on the property was too speculative, in part because it was premised on the assumption that Hogan would become the second or third largest producer of sandstone in Ohio, and that the property would then generate an income of $10,000 per year for a period of 40 years. *See Preston*, 190 N.E.2d at 452 (rejecting consideration of the value of sandstone where "[t]he evidence disclosed that it would take an indefinite period of some 20 to 30 years to remove and market the unquarried stone"). Another problem with placing a separate value on the sandstone is that Hogan's property is not zoned to permit quarrying. Hogan's mineral appraiser, however, expressed his opinion that rezoning the property would be relatively straightforward. To the extent that Hogan intended to introduce this testimony as evidence that the sandstone had value independent of the property, the district court properly refused to accord it any weight. *See Masheter v. Wood*, 305 N.E.2d 785, 787 (Ohio 1973) (stating that an appraiser "may not give his opinion as to the probability of a zoning change . . . [because s]uch an opinion constitutes speculation").

The district court did consider the testimony, however, as evidence offered in support of Hogan's argument that a typical purchaser would pay more for the property as presently zoned because of the property's potential to be rezoned to permit quarrying. *See Masheter v. Kebe*, 359 N.E.2d 74, 77 (Ohio 1976) ("If, in the opinion of an expert appraisal witness, an informed, willing purchaser would be presently agreeable to pay more than an amount justified under existing zoning, such evidence is admissible because it reflects upon the fair market value of the property.").

The government's appraiser, however, spoke with Mansfield zoning officials and concluded that there was little potential for a zoning change. In light of the fact that the property is crossed by many high-voltage power lines and towers, and because most quarrying companies usually want 100 acres or more, the district court expressed "serious reservations" as to whether quarrying the sandstone on Hogan's property was economically viable. The court was also unpersuaded by the conclusion reached by Hogan's mineral appraiser that the contamination of the property had left the sandstone completely unmarketable, because the appraiser was unaware of the cleanup activities performed by the Air Force and expressed no understanding of the nature of the mag-thor

contamination. Evidence introduced by the government, moreover, suggested that the contamination would affect only the soil and not the underlying stone.

Hogan bears the burden of demonstrating that there has been a diminution in the value of the mineral resources on his land. *See Tenn. Gas Transmission Co. v. Wolfe*, 112 N.E.2d 376, 378 (Ohio 1953). The district court found that he had presented "no testimony as to what a willing purchaser would pay for the mineral rights or for the land as a whole[,] and the court was presented with no evidence which would support a finding of the fair market value of this land as a quarry." We agree with the district court's conclusion, and find that it did not err in refusing to separately value the sandstone deposits when it determined that the mag-thor contamination had not caused any diminution in the overall worth of Hogan's property.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.