Annie Pearl SATTERWHITE, Infant by her next friend, E. L. Satterwhite, Plaintiff,

v.

Joseph A. BOCELATO and United States of America, Defendants.

Evelyn Annie CREWS, by her next friend, J. D. Crews, Plaintiff,

v.

Joseph A. BOCELATO and United States of America, Defendants.

J. D. CREWS, Plaintiff,

v.

Joseph A. BOCELATO and United States of America, Defendants.

Civ. Nos. 393, 392, 391.

United States District Court
E. D. North Carolina, Raleigh Division.

May 6, 1955.

B. S. Royster, Jr., Oxford, N. C., W. T. Joyner, Raleigh, N. C., for plaintiffs.

Howard E. Manning, Raleigh, N. C., for defendant Bocelato.

**826**

Julian T. Gaskill, U. S. Atty., Raleigh, N. C., for defendant United States.

GILLIAM, District Judge.

These actions were consolidated for trial and were heard without a jury. A claim is made in No. 392 and also in No. 393 for personal injuries, and in No. 391 for property damages sustained in a collision on June 25, 1949, between an automobile belonging to J. D. Crews, plaintiff in No. 391, being driven by Evelyn Annie Crews (now Mrs. Evelyn Crews Hicks), plaintiff in No. 392, and an automobile owned and driven by Joseph A. Bocelato, one of the defendants in all three actions.

Each plaintiff is a citizen and resident of North Carolina; defendant Bocelato is a citizen and resident of Tennessee and on the day of the collision was a Captain of the United States Army.

The collision occurred in daylight at the intersection of 12th and D Streets in Camp Butner, N. C., now under control of the State of North Carolina; Evelyn Annie Crews was driving East on 12th Street and Captain Bocelato was driving South on D Street; D Street was the subservient street and thereon at the intersection on each side of 12th Street there was the usual "Stop" sign erected by the North Carolina Highway authorities; both streets were paved, with 24 feet of hard surface and 8-foot shoulders; the speed limit on each street was 35 miles per hour and such maximum speed limit was indicated by the usual signs along the streets; trees and vines growing off the northwest corner of the intersection somewhat obstructed Captain Bocelato's view along 12th Street to his right and West of the intersection. Both streets were under the supervision and control of the North Carolina State Highway and Public Works Commission.

Upon nearing the intersection Captain Bocelato diminished his speed, but, though he saw the "Stop" sign on his right, failed to stop, as required by law; his car and the other car approaching from the West on 12th Street reached the intersection at approximately the same time and a collision occurred near the center thereof; neither car was exceeding the speed limit as it approached the intersection, or at any other time within the area or time involved; the Bocelato car struck the car driven by Evelyn Annie Crews on its left or driver's side near the front door; the Crews car was demolished and both Evelyn Annie Crews (now Evelyn Crews Hicks) and Annie Pearl Satterwhite (now Annie Satterwhite Tunstall), who was a passenger in the Crews car, suffered personal injuries.

As a result of such injuries Annie Satterwhite Tunstall has lost all serviceable vision in her right eye; her right eardrum was punctured, resulting in partial deafness; her right jawbone was fractured, seven teeth were knocked out and several others damaged; the roots from the seven teeth lost, together with other damaged teeth, must be removed; there were multiple fractures of the facial bones and, perhaps, a fracture at the base of the skull; she is permanently injured; she, of course, suffered pain and has paid and incurred medical expenses amounting to about $2,000.

Fortunately for her, the injuries to Mrs. Evelyn Crews Hicks were not so severe; she sustained many bruises and abrasions and was in a state of shock for several days; she was earning $35 per week and lost three weeks; her medical expenses were $25; she is not permanently injured.

The automobile of plaintiff J. D. Crews was damaged in the amount of $575.

At the time of the collision Captain Bocelato was stationed at Fort Belvoir, Virginia, on active duty with the Corps of Engineers; he was Commanding Officer of a bomb disposal detachment; his duties were to travel, pursuant to orders of his superiors, to military establishments throughout the country, inspect inactive artillery ranges, report conditions, and advise whether and to what extent they contained dangerous unexploded projectiles.

In early June, 1949, he was ordered to report to the District Engineer, Savan-

nah, Georgia, where in turn he was ordered to Camp Butner and there to inspect a tract of land which was formerly a part of an artillery range, and report his findings on Monday morning, June 27, 1949.

There was no government vehicle or other means of transportation available for his use at Camp Butner, and he was authorized to use his own car for travel to Camp Butner; his orders read "T.P.A.", meaning travel by private conveyance authorized; the Captain was to receive per diem expenses for food, lodging and incidental expenses; he travelled from Savannah to Butner in his private car and received mileage allowance; he arrived at Butner Friday night, June 24, and was provided quarters in abandoned barracks by the State of North Carolina; he had no office or other headquarters at Butner and used the barracks as his quarters, office and base of operations; the artillery range which he was to inspect lies about 15 miles from Butner and from where the Captain was quartered; though his orders did not specifically authorize him to use his private car, to travel from his barracks to the range, he had no alternative; such military vehicles as there were at Butner were not available for the Captain's use and the only available means of getting to and back from the land to be inspected was by his private car.

He was ordered to make his report on Monday morning, June 27, and on Saturday morning, June 25, he drove his car from his quarters to the range to make his inspection; returning to his quarters by the most direct route after making the inspection, the collision above mentioned happened; in his car at that time were maps, charts and diagrams of the area he had inspected, together with notes he had made for use in preparing his report; he was on 24-hour duty, seven days a week.

Though Captain Bocelato was authorized to use his own car in travelling to Butner, he was not required to do so; he could have used such commercial transportation as was available; had he done so, however, no means of transportation from Butner to the area to be inspected and return to his quarters would have been at hand.

The quarters being occupied by the Captain were under the control of the State of North Carolina and he paid the State for their use; he was receiving per diem allowance for personal living expenses and the government had no control of and exercised no supervision over the selection of quarters or the making of eating arrangements; after the inspection was completed Captain Bocelato was free to go where he chose and occupy his time as he saw fit, but it is reasonable to assume that he would use his quarters for the purpose of assembling his data and preparing his report which was due the following Monday morning; while it is true that he planned to eat before going to his quarters and that due to some confusion he was going to his quarters to orient himself on the location of his eating place, as a matter of fact he was taking the most direct course to his quarters, and the fact that he intended to eat before going to his quarters to work on his report surely ought not to alter the case from the standpoint of the government's liability.

■ The question of Captain Bocelato's liability to the plaintiffs is not troublesome. I find that he was guilty of negligence which proximately caused the personal injuries and property damage. There was no contributory negligence on the part of any one of the plaintiffs. N. C. General Statutes, § 20–158 provides, in part: "The State Highway and Public Works Commission, with reference to State highways * * * are hereby authorized to designate main traveled or through highways by erecting at the entrance thereto from intersecting highways signs notifying drivers of vehicles to come to full stop before entering or crossing such designated highway, and whenever any such signs have been so erected it shall be unlawful for the driver of any vehicle to fail to stop in obedience thereto." Construing this statute, the North Carolina Court has said that in

such a situation the driver on the subservient highway is not only required to stop, but, further, is required thereafter to exercise due care to see that he may enter the dominant highway in safety. It is admitted that Captain Bocelato failed to stop, and though the North Carolina Court has also said that failure to stop is only evidence of negligence, not negligence per se, such failure here, I think, justifies a finding of negligence. The driver of the other car was proceeding at a lawful and safe speed and was justified in believing that Captain Bocelato would stop for the intersection. The cars met at the center of the intersection and it seems obvious that had the Captain obeyed the law the other car would have passed safely and that there would have been no collision. Defendants do not admit the correctness of this conclusion, but I noted no serious argument at the trial or in the briefs to the contrary.

The question whether the United States is liable is close and troublesome, but I believe there is liability. Government counsel assert "that at the time of the collision and damages sustained by the plaintiffs in these actions, Joseph A. Bocelato was not acting within the scope of his employment within the purview of the Federal Tort Claims Act [28 U.S.C.A. §§ 1346, 2671 et seq.] * * * and that the United States of America is not liable under the circumstances." To support this contention, these cases are cited: United States v. Eleazer, 4 Cir., 177 F.2d 914; United States v. Sharpe, 4 Cir., 189 F.2d 239; Wilkie v. Stancil and Gilmers, Inc., 196 N.C. 794, 147 S.E. 296; Rutherford v. United States, D.C., 73 F.Supp. 867, affirmed 168 F.2d 70.

The facts in the Eleazer case were somewhat similar to the facts before me, but I see a difference. Eleazer on August 15th was ordered to report at Corpus Christi on September 1st, " 'such delay [in reporting] to count as leave'," and it was provided that " 'the travel herein enjoined is necessary in the public service' ". [177 F.2d 915.] He left Cherry Point on August 20th, driving his own automobile, intending to drive to Raleigh, then to his home in Atlanta, then to Corpus Christi to meet his orders: between Cherry Point and Raleigh the accident occurred. In rationalizing the finding of no liability, the Court said, 177 F.2d at page 916: "It is true that he had been ordered to report on September 1 at Corpus Christi and had been directed to travel there so that he could be reimbursed for the expense of travel at the regular mileage rate; but he and not the government selected the means of transportation and no officer of the government had any right to exercise control over his operation of the means chosen. All that the government was interested in was that he report for duty at Corpus Christi on Sept. 1, and he could travel there by rail, by bus, by car or by air as he saw fit. When he chose to drive his own car, instead of availing himself of commercial transportation, he was acting in furtherance of his own purposes, not those of the government; and his action in driving the car cannot reasonably be said to have been action taken within the scope of his employment or office. * * *

"It is in application of this principle (that the damage must be done while the servant is actually employed in the master's service) that the doctrine respondeat superior is held to apply 'only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of some neglect or wrong at the time *and in respect to the very transaction* out of which the injury arose.' "

In my opinion, the master and servant relationship between Captain Bocelato and the United States existed in respect to the " 'very transaction out of which the injury arose' ", that is, the travel to and from the inspection. Unlike the Eleazer case, in which the Court said "All that the government was interested in was that he report for duty at Corpus Christi on Sept. 1, and he could travel there by rail, by bus, by car or by air as he saw fit", Captain Bocelato was not on leave; he had been ordered to make an inspection at a point 15 miles from Camp Butner and there was no opportunity afforded to travel to that point by rail, by bus, by air, or even by car, unless he used

his own car. He was ordered to make his report by Monday and to meet this order it was necessary to make the inspection on Saturday, the day of the accident. It could hardly be contended that he should have walked the thirty miles. Imagine the Captain reporting to his superior that he failed to make the inspection and report because his travel orders which authorized him to use his own car to reach Camp Butner did not specifically authorize its use to reach the area 15 miles away which he was ordered to inspect, though only by so doing could he perform his mission. Under the existing conditions he had implied authority to do so.

The facts in United States v. Sharpe, 4 Cir., 189 F.2d 139, presented a stronger case from the standpoint of the government, for there the soldier was travelling at his own expense and without allowance of mileage. His company which had been ordered from Fort Bragg to Eglin Field moved by truck convoy and air transport, but the soldier had permission to drive his own car at his own expense.

In Wilkie v. Stancil and Gilmers, Inc., 196 N.C. 794, 147 S.E. 296, a completely different question was involved, and, besides, the Court is not bound in construing the federal statute by the state decisions. United States v. Sharpe, above, and other cases.

In Rutherford v. United States, D.C., 73 F.Supp. 867, a naval recruiting officer, after completing a radio broadcast, was on his way home in his private automobile to spend Sunday with his family. This case is no authority for the government under the facts here.

■ I hold that Captain Bocelato at the time of the accident was acting in furtherance of the business of the government and within the scope of his employment, and that the United States is liable for the injuries and damages resulting from his negligent act. The following cases are thought to support in a measure this conclusion. United States v. Hopper, 6 Cir., 214 F.2d 129; Marquardt v. United States, D.C., 115 F. Supp. 160; United States v. Wibye, 9

Cir., 191 F.2d 181; McConville v. United States, 2 Cir., 197 F.2d 680.

■ So that my conclusion is that both Captain Bocelato and the United States are liable to the plaintiffs, but, in view of Sec. 2676, Title 28, judgment against the United States constitutes a complete bar to the action against Captain Bocelato, and therefore the judgments will enter only against the United States. See United States v. Gilman, 347 U.S. 507, 74 S.Ct. 695, 98 L.Ed. 898.

At the trial it was stipulated that Annie Pearl Satterwhite, since the institution of No. 393, had married and is now Annie Satterwhite Tunstall, and had reached her majority, and that Evelyn Annie Crews, since the institution of No. 392, had married and is now Evelyn Crews Hicks and had reached her majority.

■■ The damages of Evelyn Crews Hicks, including loss of time and medical expenses, are assessed at $500; the damages of Annie Satterwhite Tunstall, including medical expenses, are assessed at $15,000; the damages of J. D. Crews are assessed at $575. Judgments accordingly will enter.